## TOMPKINS COUNTY OYER AND TERMINER.

### August, 1845.

Before Edmonds, Circuit Judge, and the Judges of the Common Pleas.

### The People v. Gillet.

Trial for incest.
Examination by direction of the court of the *particeps criminis*
The court's directing the jury to acquit the prisoner.
Applause and disorder in the court room, and its punishment.

THE defendant was indicted for incest with his daughter. He was a miller and farmer by occupation, an industrious, prudent man, of very fair character, and of an affectionate temper. His wife was a woman of feeble health, very intelligent, and a pious member of a church. Between the husband

and wife, and between them and their daughter, there was great affection. The daughter was about sixteen years old.

The prisoner was in the habit of working on his farm in the day-time, and running his mill at night, till it was bed-time. While thus at work in the mill, his daughter was accustomed to spending the evening there with him, and when his work was finished, she walked up to the house with him, sometimes leaning on his arm, and sometimes with her arm around his waist and his arm around her.

They were in the habit of going to church on Sundays in a one seated wagon — the father, mother, and daughter, together; the daughter sometimes sitting on her father's lap, and sometimes on the same seat with, and between, her parents.

While living in this confidential manner, a man by the name of Welsh from a neighboring town, some twenty years older than the daughter, who dealt in buying and swapping horses, and who was a class-leader in a Methodist church, paid particular attention to the daughter, and was a frequent visitor. The prisoner told her that he did not like the man — he was afraid of him, and advised her to refuse his visits, and have nothing more to do with him. She followed his advice, and at her suitor's next visit, she told him he must not come again, and gave her father's dislike of him as her reason. He became very angry, and left her.

At an ensuing court which sat in that county, an indict-ment for incest was preferred by the grand jury against the father, without any previous arrest or examination of him.

The testimony in support of the prosecution was that of several companions of Welsh, who swore that they had, on several different occasions, watched the prisoner's house from the outside, in the evening, in company of, and instigated by Welsh, and by standing on a fence fifty or sixty feet from the house, had been able to look into a window in the second story, and had seen the prisoner go to bed with a female, whom they supposed and believed was his daughter.

In opposition to this, it was testified by a large number of

the neighbors, that on three different occasions they had examined the house, fence, and premises, and that it was impossible to see, as had been testified on the part of the prosecution, and particularly impossible to identify, any person within the house, or to tell the difference between prisoner's wife, and daughter, at that distance, and under those circumstances.

Further evidence for the prosecution was given by a young girl, who had been a companion of the daughter, and who testified that she had once seen the father and daughter have connection, in a room in the barn which she described.

In opposition to that, it was proved that that witness had, when the indictment was first found, declared that she believed the charge was false; that for ten days before giving her evidence she had spent the time among the friends of Welsh, and that he had brought her to court to testify; that the room in the barn, described by her, was at the time used as a cow stable; had not been cleaned in weeks, and was then covered with fresh cow-dung; and that the gate through which she said she had passed, to go to the cow stable, had been for some time, and was then, blocked up by a log so that it could not be opened.

Welsh, himself, though it appeared that he was present, and had seen what the witnesses for the prosecution had testified to, and was then in court, was not offered as a witness, but his brother was, and of him all the witnesses agreed in saying his character was bad, and had been from boyhood.

On the other hand it was proved, that the character and deportment of the prisoner, his wife, and daughter, were of the most exemplary kind.

And it was also proved, that the deportment of his wife to the prisoner had been unchanged by these charges, and was still, as it always had been, of a most affectionate and confiding character.

The mother and daughter were, during the trial, present in court, sitting by the side of the prisoner and his counsel.

After the foregoing testimony had been given, the judge

asked the prisoner's counsel, if they did not mean to examine the daughter as a witness?

*Mr. Sibly*, for the prisoner, answered: No, if it please the court; our advice to our client was, that she should be examined, but he refuses, saying he had rather run the risk of a conviction, than subject his young daughter to the humiliation of an examination on such a subject.

*Circuit Judge:* I can appreciate his feelings, and commend the self-sacrifice which prompts to his decision. But I cannot recognize in those feelings, any reason for withholding any evidence that may throw light upon the subject. Our duty is to the due administration of justice, and as the testimony has all been, in the highest degree, favorable to the character of this young woman, and as the court and jury can alike be aided by her deportment as a witness, I must direct her to be examined.

She was accordingly sworn, and examined, and denied the whole charge against her father.

On closing the testimony, and when the counsel were prepared to address the jury, the circuit judge said he did not think it proper to allow that. The case was too clear, and all the suspicious circumstances had been too fully done away with, to warrant the court in subjecting the accused to the hazard of a submission to the jury, which might be construed into a doubt of the prisoner's innocence. There was no room for a doubt on that subject, and he should, therefore, direct a verdict of acquittal to be rendered by the jury.

*The Clerk* then addressed them: "Gentlemen of the jury hearken to your verdict, as the court has recorded it. You say you find the prisoner at the bar, not guilty, and so you say all."

The jury promptly, and with considerable feeling, answered,

"yes, not guilty," and then occurred a scene not often exhibited in our courts of justice.

The case had excited a good deal of interest, and the court-room was crowded with spectators, and as soon as the verdict was rendered, the crowd present burst into a round of applause, by what seemed to be a universal clapping of hands and stamping of feet. When at length the noise ceased —

*The Circuit Judge* said he was exceedingly pained to witness such an exhibition. It was well known to that audience that he was not in his own circuit, but had been sent to that county by the governor in consequence of a vacancy in the office of their circuit judge. Before he came there he had learned that a verdict rendered in that county, at a previous circuit, had been set aside by the Supreme Court, on the ground that the jury had sworn that there had been so much noise in the court-room on the trial, that they had been unable to hear what the court had said to them in its charge.

Thoroughly impressed, as he was, with the solemn nature of the duty of administering justice, and that a court-room ought to be as grave and decorous as a church, he had been vigilant and strict in keeping order and silence until this moment. He had now been taken by surprise, for he had not supposed that there was, or could be, a court in the land where such an unseemly exhibition of disorder could be had; evidently the people in that vicinity were not aware of the duty incumbent on them as to proper behavior in court, and it therefore was necessary for him to teach them the lesson by a striking example.

The penalty for such conduct was fine and imprisonment, at the discretion of the court, within certain limits, and he should, therefore, proceed to inflict both those punishments.

He could not expect to inflict them upon all who had offended, for it seemed to him as if every person in the room had been engaged in the disorder, and many of them with their feet, which were out of his sight. But he had seen one

The People v. Gillet.

man applaud with his hands, and of him he should make an example, so that a repetition of the offense by others might be prevented.

The judge then pointed out to the sheriff one man in the crowd, and directed him to be arrested and brought before the court.

When the offender was placed within the bar, he was addressed by —

*The Circuit Judge:* I have the power of inflicting upon you a fine of $250, and imprisonment for thirty days, for the disorder of which you have been guilty. You are not the only one thus guilty, but you are the only one I detected in the act, and I must make an example of you to deter others. I can do that summarily upon my own view of the offense; but you ought to be heard, and I therefore ask you, if you have any thing to say, why I should not proceed to judgment?

The man was very much frightened. He was pale and agitated, and said a few words incoherently.

*Circuit Judge:* I see that you are too much agitated to know what to say now, and so we will postpone any farther proceedings in the matter until to-morrow. In the meantime you can recover your self-possession, and consult counsel as to what you ought to do, and the clerk will enter an order for you to show cause to-morrow morning at the opening of the court, why you should not be fined and imprisoned.

There the proceedings ended that day.

On the next day, the court room was again densely crowded, and the offender took his stand within the bar.

*Circuit Judge:* Well, sir, have you consulted counsel in this matter?

Yes, sir, I have advised with Mr. Sibly.

*Circuit Judge:* What have you to say for him, Mr. Sibly?

*Mr. Sibly:* I have advised him, if the court please, to tell his own story.

*Circuit Judge:* Very well, let him do so.

The man then told this story. He lived in a distant part of the county from the accused in this case, and he had no acquaintance with him. But he had had an acquaintance with this horse-trading preacher, Welsh, who had at one time paid attention to his daughter. But he, not liking the man, had warned his child against him, and she, following his advice, had dismissed him. Whereupon, Welsh, as he supposed, in order to get him into the State's prison, and out of the way of his designs upon his daughter, had preferred such a charge of incest against him. But, instead of going before the grand jury in the first instance, Welsh had made his complaint before a justice of the peace, and a preliminary examination had been had, on which he had been able to prove his innocence, and he had been discharged.

Afterward, hearing of this case, so like his own, and that it was coming on to trial, he had left his home and come down to court to see how the other sufferer would come out. And when the result came, he had been so delighted and excited, that he had given vent to his feelings without thinking where he was.

*Circuit Judge:* This is really very strange; that out of at least five hundred offenders I should have been made to select for punishment the only person of whom such a story could be told. It is inexplicable to me; it seems as if the hand of Providence was in it too strong to warrant me in inflicting punishment; I shall, therefore, go no farther in these proceedings, but discharge you, with the full conviction on my own mind that the lesson taught by these circumstances will be more effective with these people than any punishment that I could inflict.

P. S. It was at this circuit that an incident happened, which I wish to preserve.

There is a law of our statute, authorizing the court, when poor persons are used as witnesses in criminal cases, to order them paid out of the county treasury. I made an allowance of $2.50 to a poor boy in such a case, and directed the clerk to enter such an order.

One of the county judges, who sat by my side, remarked that "the boy would have to stand a shave on that." I asked what he meant? He said that it was the habit of the boards of supervisors always to raise a contingent fund, so as always to have money on hand for such purposes, but their last board, in order to have the credit of reducing the amount of taxation, had omitted to raise such fund, and this order could not be paid until after the collection of the next year's taxes.

I immediately repeated aloud the information I had received, and directed the clerk to make the order $3,50, for the county could "stand the shave" better than the boy could.